UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| NORTHPOINT MORTGAGE, INC.  )<br> )<br>    Plaintiff,  )<br> )<br>v.  )<br> )<br>INTEGRITY MORTGAGE, LLC; CASEY )<br>HAMLIN; DARLENE TILTON; AND  )<br>BRANDY EGAN,  )<br> )<br>    Defendants.  ) | CIVIL NO. |

## COMPLAINT WITH REQUEST FOR JURY TRIAL

Plaintiff Northpoint Mortgage, Inc. ("Plaintiff" or "Northpoint") brings this action against Defendants Casey Hamlin ("Hamlin"), Darlene Tilton ("Tilton"), and Brandy Egan ("Egan") for breach of contract; against Defendant Integrity Mortgage, LLC ("Integrity") for aiding and abetting; and against all Defendants for violation of the Uniform Trade Secrets Act, violation of the federal Defend Trade Secrets Act, conversion, and tortious interference, as set forth below.

## JURISDISCTION AND PARTIES

1. Plaintiff Northpoint is a Massachusetts corporation with a principal place of business in Massachusetts. Northpoint also conducts business in various states including Maine, with offices located in various locations in Cumberland County and York County.

2. Defendant Integrity is a Maine limited liability company doing business in the State of Maine with offices located in Yarmouth and Portland, Maine.

3. Defendant Hamlin is an individual residing in Scarborough, Maine.

4. Defendant Tilton is an individual residing in Standish, Maine.

5. Defendant Egan is an individual residing in Acton, Maine.

6. The amount in controversy in this matter exceeds $75,000.

7. This Court has federal question jurisdiction over the subject matter of this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and pursuant to 28 U.S.C. § 1331. The Court also has diversity jurisdiction over the subject matter of this action based on the complete diversity of the parties and because the amount in controversy exceeds $75,000. In addition, the Court has supplemental jurisdiction over Northpoint's state claims pursuant to 28 U.S.C. § 1367.

## FACTS COMMON TO ALL COUNTS

8. Northpoint is engaged in the highly competitive mortgage loan lending industry.

9. Integrity is also engaged in the mortgage loan lending business industry and competes directly with Northpoint for mortgage loan lending business in Maine and other states, including Massachusetts.

10. Hamlin was employed by Northpoint as a senior loan officer and mortgage loan originator from November 1, 2015, until he voluntarily resigned his employment with Northpoint as of November 22, 2022. Hamlin began performing services for and on behalf of Integrity prior to his resignation with Northpoint and continues to be employed by Integrity as a branch manager and senior loan officer. Based upon information and belief, Hamlin also has an ownership and equity interest in Integrity.

11. Egan was employed by Northpoint as a loan partner from February 2017 until she voluntarily resigned her employment with Northpoint as of November 22, 2022. Tilton began performing services for and on behalf of Integrity prior to her resignation with Northpoint and continues to be employed by Integrity as an assistant loan officer.

12. Tilton was employed by Northpoint as a loan partner from November 2015 until she voluntarily resigned her employment with Northpoint as of November 22, 2022. Egan began

performing services for and on behalf of Integrity prior to her resignation with Northpoint and continues to be employed by Integrity as an assistant loan officer.

13. At the commencement of Hamlin's employment with Northpoint, Hamlin entered into an "Employment Agreement Commissioned Loan Originator" contract with Northpoint, effective as of November 1, 2015. Hamlin again entered into a substantially similar agreement with Northpoint as of January 8, 2016 (referred to herein as the "Hamlin Employment Agreement").

14. The Hamlin Employment Agreement is a valid and enforceable contract between Northpoint and Hamlin.

15. Under the Hamlin Employment Agreement, Hamlin agreed to specific restrictive covenants governing his conduct both during his employment and after the termination of his employment with Northpoint. Hamlin expressly agreed that the restrictions are reasonably necessary to protect Northpoint's legitimate business interests: "The restrictions contained herein are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose." Hamlin Employment Agreement, section 5.5.

16. Hamlin expressly agreed under the Hamlin Employment Agreement to protect and refrain from disclosing Northpoint's "Proprietary Information":

> Employee will not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after his employment, unless and until such Proprietary Information has become public knowledge without fault by the Employee.

Hamlin Employment Agreement, section 7.1

17. The Hamlin Employment Agreement further provides that Northpoint's "Proprietary Information"—defined to include all "information and know-how, whether or not in

writing, of a private, secret or confidential nature concerning the Company's business or financial affairs"—"is and shall be the exclusive property of the Company." *Id.*

18. The Hamlin Employment Agreement specifies that Proprietary Information includes, by way of illustration and without limitation, "financial information of a borrower's/client's or prospective borrower's/client's lists, including financial data, personal data, personnel data, computer programs and customer lists." *Id.*

19. Hamlin expressly agreed under the Hamlin Employment Agreement that all of Northpoint's data and other information containing Proprietary Information, whether created by Hamlin or others, is and shall remain the exclusive property of Northpoint to be used by Hamlin only in connection with his duties on behalf of Northpoint:

> All files, letters, memoranda, reports, financial information of borrowers, or other written, or other tangible material containing Proprietary Information, whether created by the Employee or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Employee only in the performance of his duties for the Company.

Hamlin Employment Agreement, section 7.2.

20. Hamlin expressly agreed under the Hamlin Employment Agreement that his duty not to disclose or use Northpoint's data and Proprietary Information extended to all data and information of Northpoint's customers and others, such as prospects, who may have disclosed or entrusted such information to Northpoint or Hamlin:

> Employee's obligation not to disclose or use information, know-how and records of [] types set forth in paragraphs [7.1 and 7.2] above, also extends to such types of information, know-how, records and tangible property of customers of the Company or other third parties who may have disclosed or entrusted the same to the Company or the Employee in the course of the Company's business.

Hamlin Employment Agreement, section 7.3.

21. Hamlin expressly agreed under the Hamlin Employment Agreement that, during the term of his employment and for a one (1) year period after the termination of his employment,

he would not solicit Northpoint's customers or interfere with Northpoint's relationship with its customers:

> During his employment with the Company, and for one (1) year after the termination of his employment, Employee shall not for himself, firm or other entity, solicit the business of any person or entity who was, during the six (6) months preceding the cessation of Employee's employment, a client or customer of the Company, or induce the termination, cancellation or non-renewal of any business of such client or customer with the Company.

Hamlin Employment Agreement, section 5.1.

22.     Hamlin expressly agreed under the Hamlin Employment Agreement that, for a one (1) year period after the termination of his employment, he would not directly or indirectly solicit the services of Northpoint's employees or induce them to leave their employment with Northpoint or breach their employment agreements with Northpoint. Hamlin Employment Agreement, section 5.2.

23.     Hamlin expressly agreed under the Hamlin Employment Agreement that throughout the period of his employment with Northpoint, he would refrain from carrying on any mortgage broker business, directly or indirectly, in any capacity, except in the normal course of business on behalf of Northpoint. Hamlin Employment Agreement, section 5.3.

24.     Hamlin also expressly agreed under the Hamlin Employment Agreement that during the term of his employment with Northpoint, he would "devote his/her entire business time, attention, energies, best efforts, skill and ability to the business of the Company"; would "not perform any activities or services, or accept other employment which would be inconsistent with this Agreement, the employment relationship between the parties, or would interfere with or present a conflict of interest concerning Employee's employment with the Company"; and would "diligently pursue, enhance and promote the business, reputation and welfare of the Company." Hamlin Employment Agreement, section 3.1(d), (f).

25. At the commencement of their employment with Northpoint, Egan and Tilton also separately entered into substantially similar employment agreements with Northpoint. Egan entered into an "Employment Agreement" with Northpoint effective as of February 22, 2017, and Tilton entered into an "Employment Agreement" with Northpoint effective as of November 23, 2015. Egan's Employment Agreement and Tilton's Employment Agreement are referred to herein as the "Loan Partner Employment Agreement."

26. Egan's Loan Partner Employment Agreement is a valid and enforceable contract between Northpoint and Egan.

27. Tilton's Loan Partner Employment Agreement is a valid and enforceable contract between Northpoint and Tilton.

28. Under their respective Loan Partner Employment Agreements, Egan and Tilton each agreed to specific restrictive covenants governing their conduct both during their employment and after the termination of their employment with Northpoint.

29. Egan and Tilton expressly agreed under the Loan Partner Employment Agreement to specific restrictions regarding Northpoint's "Confidential Information," and they agreed that such restrictions were a condition precedent to employment and were reasonably necessary for the protection of Northpoint's interests. Loan Partner Employment Agreement, section 8(a).

30. The Loan Partner Employment Agreement defines "Confidential Information" to mean Northpoint's confidential and proprietary information including, among other things, information concerning business plans, customer and prospective customer information and files, financial information, customer lists, and any of Northpoint's trade secrets. Loan Partner Agreement, section 8(c).

31. Egan and Tilton expressly agreed under the Loan Partner Employment Agreement that they would maintain the confidentiality of, and would refrain from using or divulging,

Northpoint's Confidential Information for the benefit of anyone other than Northpoint, both during and after their employment with Northpoint:

> All Confidential Information will be treated by the Employee as such; and both during and after the Employment Term, he/she will not, directly or indirectly, make use of such Confidential Information for his/her own benefit or the benefit of anyone other than the Company; nor will the Employee divulge such Confidential Information to anyone not duly entitled thereto; nor will he/she retain copies of any such Confidential Information or reveal the same to anyone except to the extent such Confidential Information is required by law to be disclosed.

Loan Partner Employment Agreement, section 8(d).

32. Egan and Tilton expressly agreed under the Loan Partner Employment Agreement that, for a period of one (1) year following the termination of their employment, they would not "either individually or on behalf or through any third party, directly or indirectly, solicit, entice or persuade, or attempt to solicit, entice or persuade any employee of Company to leave the employ of Company for any reason." Loan Partner Employment Agreement, section 7.

33. Egan and Tilton expressly agreed under the Loan Partner Agreement that they would at all times act in the best interests of Northpoint:

> The Employee shall adhere to all recognized professional ethics and customs, and avoid all act, habits and usage that injure in any way, directly or indirectly, the professional reputation and standing of the Company or any of its employees. The Employee shall devote his or her entire working time, attendance, loyalty, skill, best efforts and attention to the advancement of the interests and business of the Company,

Loan Partner Employment Agreement, section 4.

34. During the course of his employment with Northpoint and prior to his resignation, Hamlin conspired with Integrity to steal and misappropriate Northpoint's Proprietary Information, as defined in the Hamlin Employment Agreement, and Northpoint's trade secrets, as defined by the Uniform Trade Secrets Act and the Defend Trade Secrets Act, including but not limited to Northpoint's client and prospective client information.

35. Based upon information and belief, Integrity encouraged Hamlin to steal and misappropriate Northpoint's Proprietary Information and trade secrets, provided him with incentives to steal and misappropriate such information, and offered Hamlin employment with Integrity and an equity interest in Integrity in connection with his theft and misappropriation of Northpoint's Proprietary Information and trade secrets.

36. During the course of his employment with Northpoint and prior to his resignation, Hamlin solicited Egan and Tilton to provide mortgage loan services with him at Integrity, and he induced Egan and Tilton to terminate their employment with Northpoint and join him at Integrity.

37. Hamlin, working with Egan and Tilton, also attempted to solicit the services of at least five other Northpoint employees and attempted to induce them to terminate their employment with Northpoint.

38. While Hamlin, Egan, and Tilton were still employed by Northpoint, and prior to their resignations, they took steps to identify, locate, and misappropriate Northpoint's Confidential and Proprietary Information and trade secrets.

39. Hamlin, Egan, and Tilton conspired and worked with Integrity's staff and representatives, and Integrity's staff and representatives aided and abetted Hamlin, Egan, and Tilton, to download and transfer to Integrity Northpoint's Confidential Information and Proprietary Information and trade secrets.

40. Hamlin, Egan, and Tilton conspired and worked with Integrity's staff and representatives, and Integrity's staff and representatives aided and abetted Hamlin, Egan, and Tilton, to steal and misappropriate approximately 100 or more Northpoint customer and prospective customer confidential and proprietary loan files and information. The information contained in the files include Northpoint's Confidential and Proprietary Information and trade secrets and specific personal and financial customer information protected against disclosure by

8

federal and state privacy laws.

41. Based upon information and belief, Hamlin also conspired and worked with Integrity's staff and representatives to steal and misappropriate the entire data base of customers serviced by Hamlin on behalf of Northpoint, consisting of several thousand customers, which data base is part of Northpoint's Confidential and Proprietary Information and trade secrets.

42. Defendants acted upon their plan and did in fact steal and misappropriate Northpoint's Confidential and Proprietary Information and trade secrets.

43. The Confidential and Proprietary Information and trade secrets stolen and misappropriated by Hamlin, Egan, and Tilton—and transferred to Integrity with Integrity's knowing acquiescence and assistance—includes, but is not limit to customer and prospective customer: names, contact information, social security numbers, dates of birth, marital information, phone numbers, employment information (company, title, length, history), income (base, overtime, commissions, bonuses), other income sources and amounts, assets (balances, financial institutions, banking account type, banking account numbers), assets and liabilities, credit report information, real estate holdings and interests, loan information (including rates, balances, and terms), child support and alimony information, foreclosure information, bankruptcy information, residency and visa status, military history, internal private emails, asset reports, financial information, and other Confidential and Proprietary Information and trade secrets.

44. Northpoint's investigation has uncovered substantial data file transfers and cooperation between Hamlin, Egan, and Tilton—while they were still employed by Northpoint—and Integrity in the theft and misappropriation of Northpoint's Confidential and Proprietary Information and Trade Secrets, including but not limited to:

- Multiple emails dated November 21, 2022, between Egan and Rick Airey and Sara Wescott of Integrity regarding the transfer of Northpoint's customer files to Integrity;

- Emails dated November 22, 2022, between Tilton, Egan, Ms. Wescott, and Mr. Airey in which Mr. Airey states "Just confirming that I was able to successfully import all files that were sent from Brandy [Egan] and Darlene [Tilton]. Thanks!!";
- Emails dated November 10, 2022, between Mr. Hamlin, Mr. Airey, Tilton, and K. Townsend of Townsend Real Estate, in which (1) Mr. Hamlin informs Ms. Townsend that he and his "team" are in transition to Integrity and admitting that he will transfer the pre-approval request for a new customer to Mr. Airey for processing; (2) Mr. Airey informs Ms. Townsend that he will process the pre-approval for the customer that Ms. Townsend had just attempted to refer to Northpoint; and (3) Mr. Hamlin instructs Tilton to "Add to LT. I contacted [the customer] and am handling with Rick [Airey]";
- Emails dated November 16, 2022, between Hamlin and Ms. Wescott in which Ms. Wescott and Hamlin traded and attached a "made app letter" for the loan application of a Northpoint customer or prospective customer provided by Mr. Hamlin;
- Emails dated November 21, 2022, between Hamlin, Tilton, Egan, and Mr. Airey in which they are testing to see which method of transferring Northpoint's Confidential and Proprietary Information and trade secrets to Integrity works best;
- Emails dated November 20 and 21, 2022, between Hamlin, Ms. Wescott, and Mr. Airey, in which Hamlin is transferring Northpoint's Confidential and Proprietary Information and trade secrets to Integrity, and Mr. Airey confirms that the customer information was placed into Ms. Wescott's "prospects folder"; and
- Northpoint customer loan application and loan estimate documents transferred by Hamlin, Tilton, and Egan to Integrity Mortgage.

45. Both during and after his employment with Northpoint, Hamlin has contacted and solicited, and has attempted to contact and solicit, the business of Northpoint's customers and prospective customers, and has induced or attempted to induce the termination, cancellation, or non-renewal of Northpoint's business with its customers and prospective customers, using the Confidential and Proprietary Information and trade secrets that he stole and misappropriated from Northpoint.

46. Based upon information and belief, Hamlin has contacted and solicited the business of the entire misappropriated data base of Northpoint's customers and prospective customers for whom he performed services on behalf of Northpoint for the purpose of soliciting their business and inducing the cancellation, termination, and non-renewal of business with Northpoint.

47. In addition, Hamlin has conspired with Integrity's staff to contact and solicit or attempt to solicit the business of Northpoint's customers and prospective customers, and to induce

10

or attempt to induce the termination, cancellation, or non-renewal of Northpoint's business with its customers and prospective customers, using the Confidential and Proprietary Information and trade secrets that he stole and misappropriated from Northpoint.

48. In soliciting and attempting to solicit the business of Northpoint's customers, Defendants falsely and fraudulently misrepresented to Northpoint's customers that Hamlin's "branch was acquired by Integrity."

49. By their conduct as set forth above, Hamlin, Egan, and Tilton have breached and continue to breach and violate the terms of their respective employment agreements with Northpoint.

50. Northpoint has performed all of its obligations under the respective employment agreements.

51. Immediately upon learning of Defendants' wrongful conduct, Northpoint through counsel sent Defendants separate cease and desist letters and demanded that Defendants take steps to protect and secure, and to permanently and irretrievably delete and purge, all of Northpoint's Confidential and Proprietary Information and trade secrets and to provide adequate assurances that they will comply with their contractual, statutory, and legal obligations.

52. Northpoint has incurred substantial expenses, fees, and costs in addressing Defendants' statutory violations and breaches, including but not limited to attorneys' fees and costs and expenses in providing notice to consumers regarding the breach of privacy data and providing notices to state regulatory agencies regarding the breach of privacy data pursuant to applicable state consumer privacy laws.

53. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract—Against Hamlin

54. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 53 above as if fully set forth herein.

55. Hamlin's conduct as set forth above constitutes separate breaches and anticipatory breaches of the Hamlin Employment Agreement and his duty of loyalty as set forth in the Hamlin Employment Agreement.

56. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Hamlin's breach and anticipatory breach of contract.

### COUNT II
### Breach of Contract—Against Egan and Tilton

57. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 56 above as if fully set forth herein.

58. Egan's and Tilton's conduct as set forth above constitute separate breaches and anticipatory breaches of the Loan Partner Employment Agreement and their duties of loyalty as set forth in the Loan Partner Employment Agreement.

59. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Egan's and Tilton's breach and anticipatory breach of contract.

### COUNT III
### Violation of the Uniform Trade Secrets Act, 26 M.R.S.A. §§ 1541 et seq.—Against All Defendants

60. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 59 above as if fully set forth herein.

61. Defendants' conduct as set forth above constitutes separate violations of the Maine Uniform Trade Secrets Act.

62. Northpoint's Confidential and Proprietary Information constitute trade secrets as defined by applicable law in that the information derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

63. Among other things, Northpoint requires its employees who will have access to its Confidential and Proprietary Information to enter into employment agreements with strict confidentiality and non-disclosure provisions; limits access to employees who have specific need to access or use the information; and protects the information through password and other strict security protocols.

64. Hamlin's, Egan's, and Tilton's conduct amounts to misappropriation of Northpoint's trade secrets in that, among other things, they used improper means to acquire the trade secrets, and they knew or had reason to know that the trade secrets were acquired under a duty to maintain its secrecy.

65. Integrity's conduct amounts to misappropriation of Northpoint's trade secrets in that, among other things, Integrity acquired the trade secrets of Northpoint through a person who knew or had reason to know that the trade secrets were acquired by improper means, and Integrity knew or had reason to know that the trade secrets were derived from or through a person who had utilized improper means to acquire them, or were derived from or through a person who owed a duty Northpoint to maintain their secrecy or limit their use.

66. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Defendants' violation of the Maine Uniform Trade Secrets Act.

## COUNT IV
Violation of the Defend Trade Secrets Act—18 U.S.C. §§ 1836 et seq.—Against all Defendants

67. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 66 above as if fully set forth herein.

68. Northpoint's trade secrets as described above relate to products or services that are used in or are intended to be used in interstate commerce.

69. Defendants' conduct as set forth above constitutes separate violations of the Defense of Trade Secrets Act.

70. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Defendants' violation of the Defend Trade Secrets Act.

## COUNT V
Conversion/Civil Theft—Against all Defendants

71. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 70 above as if fully set forth herein.

72. By their conduct as set forth above, Defendants have engaged in theft of property and have converted and misappropriated for their use Northpoint's property, goodwill, Confidential and Proprietary Information and trade secrets, and property interest in its accounts without authorization.

73. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Defendants' conversion and theft.

## COUNT VI
Tortious Interference—Against All Defendants

74. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 73 above as if fully set forth herein.

75. By their actions as set forth above, Defendants have tortiously interfered with the advantageous economic relationships between Northpoint and its customers and prospective customers.

76. Defendants interfered with Northpoint's relationship with its customers and prospective customers by using improper means and fraudulently misrepresenting or implying that Hamlin's "branch was acquired by Integrity."

77. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Defendants' tortious interference.

## COUNT VII
### Aiding and Abetting—Against Integrity

78. Northpoint repeats and realleges the allegations set forth in paragraphs 1 through 77 above as if fully set forth herein.

79. Integrity knew or had reason to know that Hamlin's, Egan's, and Tilton's conduct as set forth above constituted a breach of duty owed to Northpoint, and Integrity gave substantial assistance or encouragement to Hamlin, Egan, and Tilton in breaching the duty they owed to Northpoint.

80. As set forth above, (1) Hamlin, Egan, and Tilton engaged in wrongful acts that caused injury to Northpoint; (2) Integrity was generally aware of its role as part of an overall illegal and tortious activity at the time it provided assistance; and (3) Integrity knowingly and substantially assisted in such violations.

81. Northpoint has suffered and continues to suffer damages as a direct and proximate result of Integrity's wrongful aiding and abetting.

**PRAYER FOR RELIEF**

Northpoint respectfully requests relief from the Court as follows:

1.	An award of all available damages, including but not limited to compensatory damages, statutory damages, liquidated damages, and punitive damages, together with all available interest.

2.	All costs of suit, including but not limited to reasonable attorneys' fees; and

3.	Such other and further relief as the Court deems just and appropriate.

Dated: January 5, 2023

                                                */s/ Eric J. Uhl*
                                                Eric J. Uhl
                                                David Ginzer
                                                Richardson, Whitman, Large & Badger
                                                465 Congress Street
                                                Portland, Maine 04112-9545
                                                (207) 774-7474
                                                euhl@rwlb.com
                                                dginzer@rwlb.com

                                                Attorneys for Plaintiff Northpoint Mortgage, Inc.